**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **DONALD F. MOOREHEAD, SHELLEY B.** | ) | |
| **MOOREHEAD, DGS, LLC, DGS PLANNING** | ) | |
| **LLC, SNOWY VENTURES, LLC, CAPITAL** | ) | |
| **STRATEGIC INVESTMENT FUND, LLC,** | ) | |
| **HIGHLAND HOLDINGS, INC., and THE** | ) | |
| **D. MOOREHEAD REVOCABLE TRUST,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 11 C 106** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **DEUTSCHE BANK AG and DEUTSCHE** | ) | |
| **BANK SECURITIES, INC. d/b/a DEUTSCHE** | ) | |
| **BANK ALEX.BROWN, a DIVISION OF** | ) | |
| **DEUTSCHE BANK SECURITIES INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Donald F. Moorehead, Shelley B. Moorehead, and several associated business

entities have sued Deutsche Bank AG and Deutsche Bank Securities, Inc. for their

alleged role in inducing plaintiffs to pursue faulty tax-reducing investment strategies.

They have brought claims for violations of the Racketeer Influenced and Corrupt

Organizations Act (RICO), 18 U.S.C. § 1962(c) & (d), breach of fiduciary duty,

negligence, negligent misrepresentation, fraud, violations of the Illinois Consumer Fraud

and Deceptive Business Practices Act, 815 ILCS 505/2, and civil conspiracy.

Defendants have moved to dismiss all of plaintiffs' claims pursuant to Federal Rule of

Civil Procedure 12(b)(6).  For the reasons stated below, the Court grants defendants'

motion.

**Background**

The Court draws the following facts from the allegations in plaintiff's complaint and accepts them as true for purposes of the motion to dismiss. *See Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009).

In early 1998, a partner in the accounting firm KPMG, LLC arranged a meeting with Donald Moorehead. Moorehead was expecting a capital gain from sales of stock. According to the partner, KPMG "had developed a tax-reducing investment strategy that could provide Plaintiffs with an opportunity for a substantial profit on the investments as well as legally reduce Plaintiffs' anticipated taxes." Compl. ¶ 48. The firm "would work closely with other highly reputable firms, including Deutsche Bank and [the law firm of] Sidley Austin" in the implementation of the strategy. *Id*. The KPMG partner insisted that the strategy, known as "OPIS" (Offshore Portfolio Investment Strategy), was perfectly legal. He indicated that an independent legal opinion letter from Sidley Austin would establish the strategy's legitimacy and that Deutsche Bank and the financial services firm Presidio "would handle all aspects of the investment component." *Id*. Other KPMG and Presidio representatives later reiterated these assertions. Plaintiffs allege that the firms' representatives touted a well-established working relationship between KPMG, Deutsche Bank, Sidley Austin, and Presidio and that Deutsche Bank and Sidley Austin had specifically "authorized KPMG and Presidio to use their names and reputations . . . to convince Plaintiffs to execute the OPIS strategy." *Id*. ¶ 51.

Based on these representations, Moorehead and plaintiff Shelley Moorehead, chose to engage in the OPIS strategy for the 1998 tax year. The OPIS strategy

involved entering

> a purported investment transaction with a Cayman Islands entity by purchasing a warrant or entering into a swap. The Cayman Islands entity then makes a pre-arranged series of investments, including the purchase of stock from a bank using money loaned by the bank at a pre-arranged price. The Cayman Islands entity is then redeemed out of the stock a short time later. Because the basis of the Cayman Islands entity purportedly cannot be used in the redemption, the basis is purportedly shifted to stock held by the taxpayer thereby creating a significant loss.

*Id*. ¶ 54. The Mooreheads formed plaintiff DGS Planning, LLC, eighty percent of which was owned by plaintiff D. Moorehead Revocable Trust, in order to implement the strategy, which included the purchase and resale of Deutsche Bank stock. After plaintiffs had completed the pre-arranged steps, KPMG prepared their 1998 tax returns.

In 1999, plaintiffs went through a similar series of meetings and received a similar set of assurances, this time focused on the "BLIPS strategy" (Bond Linked Premium Issue Structure). BLIPS

> purportedly generated a tax loss through a series of steps that involved the taxpayer borrowing money from a bank in order to purchase certain foreign currency investments through a joint venture. The bank involved in the loan would also serve as the counterparty on the foreign currency transactions. The joint venture would then sell the foreign currency back to the bank purportedly creating a tax loss for the taxpayer through increased basis.

*Id*. ¶ 73. The Mooreheads formed plaintiff Snowy Ventures, LLC to carry out the BLIPS strategy. KPMG then prepared the plaintiffs' 1999 tax returns.

The IRS ultimately determined that the purported losses created by these transactions were not properly allowable for federal income tax purposes. The IRS notified the public of this fact in a series of published notices. On December 27, 1999, it issued a notice stating that losses arising from the OPIS and BLIPS strategies were not allowable. On August 11, 2000, it published a notice stating that the transactions

were fraudulent and illegal. On July 26, 2001, the IRS published a notice stating that the type of transaction used by the OPIS strategy could be subject to disallowance. The IRS also advertised a "Tax Amnesty Program" in 2001-2002, through which it agreed to forego assessing penalties against taxpayers who had entered tax-shelter transactions in return for information regarding the transactions. Finally, the IRS issued global settlement offers on October 4, 2002 for participants in the OPIS strategy, and on May 5, 2004 for participants in the BLIPS strategy, allowing the participants to avoid penalties and recognize a portion of their claimed capital losses. Plaintiffs did not participate in the amnesty program or take advantage of the settlement offers. The IRS audited plaintiffs' tax returns, and, on February 5, 2009, it issued a notice of deficiency to plaintiffs regarding the 1998 tax year. The IRS has also "indicated it will disallow the losses purportedly created by the 1999 BLIPS Strategy and assess plaintiffs with back taxes and substantial penalties and interest." *Id*. ¶ 94.

Plaintiffs filed this suit on January 7, 2011. In addition to Deutsche Bank AG and Deutsche Bank Securities, Inc., plaintiffs originally sued Sidley Austin, which is headquartered in Illinois. Before defendants filed their motion to dismiss, however, plaintiffs voluntarily dismissed Sidley Austin from the case pursuant to Fed. R. Civ. P. 41(a).

### Discussion

In addressing a motion to dismiss, the Court accepts the plaintiffs' allegations as true and draws reasonable inferences in their favor. *Parish v. City of Elkhart*, 614 F.3d 677, 679 (7th Cir. 2010); *Johnson v. Apna Ghar, Inc.*, 330 F.3d 999, 1001 (7th Cir. 2003). Federal Rule of Civil Procedure 8(a)(2) requires the plaintiffs to provide "a short

and plain statement" showing that they are entitled to relief. Though a complaint need not contain "detailed factual allegations, . . . a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, the plaintiffs must provide "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

Defendants have moved to dismiss based in part on their contention that plaintiffs' claims are time-barred. The statute of limitations, of course, is an affirmative defense. "While complaints typically do not address affirmative defenses, the statute of limitations may be raised in a motion to dismiss if the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (internal quotation marks and citation omitted).

Plaintiffs have agreed with defendants that their claims for violations of the Illinois Consumer Fraud Act should be dismissed and have also withdrawn their claim for disgorgement.[1] Accordingly, the Court dismisses Counts 6 and 8 of plaintiffs' complaint with prejudice. In this decision, the Court first addresses plaintiffs' remaining state law claims and then discusses their RICO claims.

## A.     State Common Law Claims

### 1.     The applicable statutes of limitations

A federal court applies the forum state's choice-of-law rules in determine the law that governs a state-law claim. *Demitropoulos v. Bank One Milwaukee, N.A.*, 915 F.

---

[1]Defendants correctly argue that "disgorgement" is a remedy rather than an independent cause of action.

5

Supp. 1399, 1413 (N.D. Ill. 1996) (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 20 F.3d 713, 718-19 (7th Cir. 1994), *rev'd on other grounds*, 514 U.S. 52 (1995)). For procedural matters, including the statute of limitations, Illinois applies the law of the forum. *Newell Co. v. Petersen*, 325 Ill. App. 3d 661, 669, 758 N.E.2d 903, 908 (2001) (citing *Marchlik v. Coronet Ins. Co.*, 40 Ill. 2d 327, 329, 239 N.E.2d 799, 801 (1968)).

An Illinois statute provides that "[w]hen a cause of action has arisen in a state or territory out of this State, or in a foreign country, and, by the laws thereof, an action thereon cannot be maintained by reason of the lapse of time, an action thereon shall not be maintained in this State." 735 ILCS 5/13-210. The parties agree that plaintiffs' causes of action arose in Texas, because that was their state of residence and the state where the transactions occurred. Thus if the Illinois borrowing statute applies to this case, Texas statutes of limitation govern if they are shorter than those of Illinois.

The Illinois Supreme Court has held that the borrowing statute requires "that all parties be non-Illinois residents at the time the action accrued . . . ." *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 309 Ill. App. 3d 730, 737, 723 N.E.2d 687, 693 (1999) (citing *Miller v. Lockett*, 98 Ill. 2d 478, 481-83, 457 N.E.2d 14, 16-17 (1983)). Some Illinois courts have held that the statute also requires the parties to retain their non-residency throughout the foreign limitation period. *Compare Ehlco*, 309 Ill. App. 3d at 737, 723 N.E.2d at 693 (non-residency must be continuous), *with Newell*, 325 Ill. App. 3d at 670, 758 N.E.2d at 909 (non-residency requirement only applies to accrual). Plaintiffs argue that because Sidley Austin, an Illinois resident, was a party to the case when plaintiffs filed it, the borrowing statute does not apply. Defendants respond that the Court should not take the residence of dismissed parties into account.

6

The Court has not found a definitive determination from Illinois or federal courts regarding this issue, which turns more on the meaning of the word "parties" than anything else. Sidley Austin was an Illinois resident both when the cause of action accrued and when the case was filed. The plaintiffs and the defendants who remain in the case were not Illinois residents at either time. Thus, if "all parties" does not include dismissed parties, the borrowing statute applies.

The Court concludes that the borrowing statute does not take into account the residence of dismissed parties and that it therefore applies in this case. A rule that depends on the identity of the "parties" logically concerns only the parties who are in the suit when the rule is applied. A contrary rule would allow a plaintiff to avoid application of the borrowing statute by suing a sham Illinois defendant here along with the real, non-Illinois defendants. This would be contrary to the borrowing statute's purposes, which include discouragement of forum shopping. *See Miller*, 98 Ill. 2d at 486, 457 N.E.2d at 17.

In sum, the Court concludes that the Illinois borrowing statute applies. Texas law therefore provides the statutes of limitation for plaintiffs' state-law claims, because each Texas limitation period is shorter than its Illinois counterpart. The plaintiffs' claims for breach of fiduciary duty, fraud, and conspiracy are subject to the Texas limitation period of four years. *Compare* Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a), *with* 735 ILCS 5/13-205 (five years). The plaintiffs' claims for negligence and negligent misrepresentation are subject to a limitation period of two years. *Compare* Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a), *with* 735 ILCS 5/13-205 (five years).

**2.      The applicable accrual rules**

The parties dispute when plaintiffs' causes of action accrued.  Plaintiffs contend that the limitation period did not begin to run until, at the earliest, February 5, 2009 – the date when the IRS issued a notice of deficiency and assessed them with back taxes, interest, and penalties.  Defendants argue that the causes of action accrued, if not by 1998 and 1999 when the transactions took place, then at the latest by 2001, once the IRS had issued three public notices describing such transactions as improper and offered a tax amnesty program for taxpayers who had participated.

The Court must first determine which state's law determines the accrual date for plaintiffs' claims.  Defendants contend that Texas law applies through the Illinois borrowing statute, governing accrual as well as the length of the limitation period.  Plaintiffs argue that the Court should not consider this argument because defendants advanced it for the first time in their reply brief.  The Court disagrees.  Though typically "[a]rguments made for the first time in a reply brief are waived," *United States v. Adamson*, 441 F.3d 513, 521 n.2 (7th Cir. 2006), the primary reason for this is that the opposing party does not have a chance to respond to such arguments.  The Court eliminated that problem when it allowed plaintiffs to file a surreply to address defendants' argument.

Illinois courts have not conclusively established whether the application of the borrowing statute requires importing the accrual rules of the state from which the limitation period is borrowed.  However, at least one Illinois Appellate Court decision applying the statute has borrowed accrual rules along with the limitation period.  *See Mackereth v. G.D. Searle & Co.*, 285 Ill. App. 3d 1070, 1074, 674 N.E.2d 936, 939

(1996).  This accords with language of the statute, which strongly indicates that the

borrowed state's accrual rules apply:  it refers not specifically to the borrowed state's

limitation period but instead to whether the cause of action would be barred by the laws

of the other jurisdiction.  That inquiry necessarily includes not just the borrowed state's

limitation period but also its accrual and tolling rules.  "[A]ny period of limitation is utterly

meaningless without specification of the event that starts it running."  *Klehr v. A.O.*

*Smith Corp.*, 521 U.S. 179, 198 (1997) (Scalia, J., concurring).

This is consistent with the "general principle that the borrowed statute of

limitations is accepted with all its accouterments [sic]."  *Speight v. Miller*, 437 F.2d 781,

783 n.4 (7th Cir. 1971) (quoting *Am. Sur. Co. of N.Y. v. Gainfort*, 219 F. 2d 111, 112 (2d

Cir. 1955)).  Though *Speight* focused on applying another state's tolling rules, other

courts have found that "[i]ncluded among such accoutrements are rules governing the

time when causes of action accrue for purpose [sic] of beginning the limitations period."

*Plumb v. Cottle*, 492 F. Supp. 1330, 1336 (D. Del. 1980); *see also Saylor v. Lindsley*,

302 F. Supp. 1174, 1180 (S.D.N.Y. 1969).  Judges in this district have followed this

approach when applying the Illinois borrowing statute.  *See, e.g.*, *Westfalia-Surge, Inc.*

*v. Dairy Tex, Inc.*, No 03-4304, 2003 WL 22478742, at *2 (N.D. Ill. Nov. 4, 2003);

*Caraluzzi v. Prudential Securities, Inc.*, 824 F. Supp. 1206, 1214 (N.D. Ill. 1993).

**3.     When plaintiffs' claims accrued**

Texas law generally holds that "a cause of action accrues when a wrongful act

causes some legal injury, even if the fact of injury is not discovered until later, and even

if all resulting damages have not yet occurred."  *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex.

1996).  Texas applies, however, a "discovery rule" exception "in cases of fraud and

9

fraudulent concealment, and in other cases in which 'the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable.'" *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997) (quoting *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex. 1996)). Under Texas' version of the discovery rule, "a claim accrues when the claimant knows or in the exercise of ordinary diligence should know of the wrongful act and resulting injury." *Murphy*, 964 S.W.2d at 271.

Plaintiffs contend that they suffered no cognizable injury until the IRS assessed back taxes and penalties against them. The Court disagrees. First, Texas courts have established that "[a] person suffers legal injury from faulty professional advice when the advice is taken," even if the discovery rule delays accrual of a cause of action until later. *Murphy*, 964 S.W.2d at 270. In *Hoover v. Gregory*, 835 S.W.2d 668 (Tex. App. 1992), the Texas Appellate Court considered a suit against sellers of tax-shelter packages later found invalid by the IRS. The court rejected "a general rule that until tax liability is determined, a taxpayer suffers no harm . . . ." *Id.* at 673. More generally, under Texas law, "knowing and unconscionable misrepresentations . . . are deceptive trade practices and inherently unlawful at inception [and therefore] were completed wrongs that caused legal injury to the claimants when the acts occurred." *Sutton v. Mankoff*, 915 S.W.2d 152, 157 (Tex. App. 1996). Even were this not the case, plaintiffs were injured at the time of the transactions in that they paid fees to defendants. Disgorgement of those very fees is a major aspect of the relief plaintiffs seek through this lawsuit.

The fact that plaintiffs suffered legal injury at the time of the transactions does not mean that their causes of action necessarily accrued then. Plaintiffs contend that they could not have discovered their injury until the IRS issued its notice of deficiency.

10

Under the Texas discovery rule, a cause of action "accrues when the claimant knows or in the exercise of ordinary diligence should know of the wrongful act and resulting injury." *Murphy*, 964 S.W.2d at 271.

In *Murphy*, the Texas Supreme Court concluded that "an accounting malpractice claim involving tax advice is inherently undiscoverable" at the time the advice is given because "tax matters are often not within the average person's common knowledge," and therefore the accrual of such a claim is governed by the discovery rule. *Id*. at 271. That does not mean, however, that such a claim does not accrue until the IRS assesses a penalty. The court in *Hoover*, on an even more closely analogous fact pattern, found that the cause of action "accrued when [plaintiffs] were or should have been aware with reasonable diligence that there was some concrete and specific risk of harm to their legally protected interests." *Hoover*, 835 S.W.2d at 674.

In this case, it is clear from the complaint's allegations that plaintiffs had, or with reasonable diligence should have had, awareness of a concrete risk of harm to their economic interests well before the date in 2009 when they claim to have discovered their injury. *See id*. Plaintiffs' complaint states:

> On October 4, 2002, the IRS issued a formal settlement offer for taxpayers who invested in the OPIS Strategy, including Plaintiffs. In Announcement 2002-97, the IRS offered to settle by allowing taxpayers to recognize approximately 20% of their claimed capital losses, and avoid penalties relating to the OPIS Strategy. Each of the Defendants had knowledge of the settlement offer and its applicability to Plaintiffs. Despite their knowledge that the OPIS Strategy was an illegal and abusive tax shelter *and the fact that the IRS was auditing Plaintiffs' 1998 tax return*, the Defendants and the Other Participants failed to advise Plaintiffs to enter into the IRS settlement offer."

Compl. ¶ 92 (emphasis added).

On May 5, 2004, the IRS issued a formal settlement offer for taxpayers who

> invested in the BLIPS Strategy, including Plaintiffs.  In Announcement 2004-46, the IRS offered to settle by allowing taxpayers to pay only a 10% penalty.  Each of the Defendants had knowledge of the settlement offer and its applicability to Plaintiffs.  Despite their knowledge that the BLIPS Strategy was an illegal and abusive tax shelter *and the fact that the IRS was auditing Plaintiffs' 1999 tax return*, the Defendants and the Other Participants failed to advise Plaintiffs to enter into the IRS settlement offer.

*Id*. ¶ 93 (emphasis added).

Defendants argue that via these allegations, plaintiffs admit that they received a notice of audit specifically directed at the OPIS strategy by October 2002 and a notice of audit concerning the BLIPS strategy by May 2004.  Def.'s Mem. at 12.  In their reply, plaintiffs effectively concede this.  They do not dispute that they had received notices of audit by those dates.  Rather, they dispute only that they were being "actively audit[ed]" by those dates and argue that receipt of a notice of audit does not trigger the statute of limitations.  Pl.'s Resp. at 13 n.6.

The mere fact of an IRS audit may not be enough to put a potential plaintiff on notice of a claim for fraudulent tax advice.  As plaintiffs point out, the IRS randomly selects some tax returns to audit, and an audit notice may inform a taxpayer only that his tax return will be subject to examination, without identifying possible defects.

In this case, however, there was additional information available to plaintiffs.  The IRS issued multiple announcements about the illegality of the tax strategies as early as 1999.  Plaintiffs' complaint refers to these announcements as "unequivocal," Compl. ¶ 90; having a "clear message," *id*. ¶ 85; and "clearly and unequivocally" stating that the OPIS and BLIPS strategies were "fraudulent and illegal."  *Id*. ¶ 87.  Some courts have held that the publication of such announcements by the IRS is, by itself, enough to put a potential plaintiff on notice of a claim regarding faulty tax strategies.

12

*See, e.g.*, *Hutton v. Deutsche Bank AG*, 541 F. Supp. 2d 1166, 1171-72 (D. Kan. 2008) (finding information contained in IRS notices "reasonably ascertainable" under similar discovery rule); *Bishnu C. Borah, M.D., P.C. v. Monumental Life Ins. Co.*, No. 04-3617, 2007 WL 1030477, at *4 (E.D. Pa. Apr. 2, 2007) (finding under similar discovery rule that IRS publication was sufficient to put plaintiff on notice of claim regarding faulty life insurance product despite contrary advice from tax attorney).

Moreover, plaintiffs state in their complaint that "the Defendants' co-conspirator . . . actually advised Plaintiffs **not** to enter into the [2001/2002] IRS disclosure initiative." Compl. ¶ 91 (emphasis in original).[2] This indicates that plaintiffs were aware of at least some of the IRS announcements concerning the OPIS and BLIPS strategies and thus were on notice of the potential illegality of their tax treatment of the pertinent transactions even before they received notices of audit.

In light of these factors, "the allegations of the complaint reveal that relief is barred by the applicable statute of limitations." *See Logan v. Wilkins*, 644 F.3d 577, 582 (7th Cir. 2011). The allegations quoted above make clear that plaintiffs knew no later than October 4, 2002 that the IRS was auditing their 1998 tax returns, and no later than May 5, 2004 that it was auditing their 1999 tax returns. They also admit that they were on notice by those dates of the existence of at least one IRS disclosure initiative regarding the tax-reducing strategies.

Though this information may not, in itself, have demonstrated the strategies'

---

[2]In the portion of the complaint that details their claims, plaintiffs further suggest that defendants affirmatively advised them that other IRS notices were inapplicable to their transactions. Compl. ¶ 196 (32), (36), (40).

illegality, it was sufficient to alert plaintiffs that something was amiss. It therefore should have led plaintiffs to "exercise . . . ordinary diligence" and investigate further. *See Murphy*, 964 S.W.2d at 271. The exercise of such diligence would have led plaintiffs to the many notices the IRS had published, notices which by plaintiffs' own admission clearly demonstrate the strategies' illegality. Thus, by May 5, 2004, plaintiffs "were or should have been aware with reasonable diligence that there was some concrete and specific risk of harm to their legally protected interests." *Hoover*, 835 S.W.2d at 674. The fact that they should have been aware of this injury by that date was enough, under *Murphy* and *Hoover*, to start the clock on the limitation period.

It is true, as plaintiffs point out, that the court in *Hoover* determined that the claims of the plaintiffs in that case accrued upon their receipt of IRS notices of deficiency. The court indicated that it chose that date because the notices provided the plaintiffs with information that the underlying transactions were "shams entered into for tax avoidance purposes" and "lack[ed] economic substance." *Hoover*, 835 S.W.2d at 674. The notices were the plaintiffs' only apparent source of information regarding "a risk of harm that the . . . deductions were unacceptable and that the IRS was assessing a deficiency against them." *Id*.

The plaintiffs in this case, by contrast, were able to access information that their deductions were arguably in question much earlier, as the Court has described. A claim accrues under Texas law "not when injury becomes certain, but when the claimant should know of his injury." *Murphy*, 964 S.W.2d at 271. As the Texas Supreme Court noted in *Murphy*, "a taxpayer may know his advice was faulty long before he receives a deficiency notice. . . . No Texas court has [held] that a cause of

14

action for faulty advice never accrues until the taxpayer receives a deficiency notice." *Id.* The plaintiffs in the present case should have ascertained the same information from the IRS announcements that the *Hoover* plaintiffs received from the notices of deficiency. Thus they should have known of their claims no later than the dates by which they knew the IRS was auditing them.

"Dismissing a complaint as untimely at the pleading stage is an unusual step . . . . But dismissal is appropriate when the plaintiff pleads himself out of court by alleging facts sufficient to establish the complaint's tardiness." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674-75 (7th Cir. 2009). The Court concludes that the allegations in plaintiffs' complaint establish that their state-law claims accrued no later than October 4, 2002 with respect to the OPIS strategy and no later than May 5, 2004 with respect to the BLIPS strategy. Because the longest limitation period applicable to any of plaintiffs' claims is four years, and they did not file their lawsuit until January 7, 2011, the claims are time-barred unless the statutes of limitation were tolled.

**4.      Tolling of the statutes of limitation**

Plaintiffs have advanced two arguments regarding tolling of the statutes of limitations. First, they contend that their class membership in two class-action lawsuits, in one of which class certification was not denied until 2010, tolled the statutes of limitation under the doctrine of *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). In *American Pipe*, the Supreme Court held that the commencement of a class action tolls the limitation period for any class members who make timely motions to intervene once class certification is denied. *Id.* at 552-53. The court later extended its holding to include plaintiffs who bring individual actions after denial of class certification

15

or who opt out of the class action in order to file their own claims. *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350-52 (1983). Plaintiffs argue that their class membership in two federal class actions – *Becnel v. KPMG, LLP*, 229 F.R.D. 592, 595 (W.D. Ark. 2005), and *Kottler v. Deutsche Bank AG*, No. 05-7773, 2010 WL 1221809 (S.D.N.Y. Mar. 29, 2010) – tolled the statutes of limitation on their state-law claims.

"Like the statute of limitations itself, rules that are an integral part of the statute of limitations, such as tolling and equitable estoppel, are treated as substantive for purposes of the *Erie* doctrine," and a federal court therefore applies the law of the state in which it sits. *Hollander v. Brown*, 457 F.3d 688, 694 (7th Cir. 2006) (citations and internal quotation marks omitted); *see also Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*, 642 F.3d 560, 563 (7th Cir. 2011) (citing *Chardon v. Fumero Soto*, 462 U.S. 650 (1983)) ("[W]hen the statute of limitations depends on state law, then state rules determine the tolling effect of a class suit, even if all litigation occurs in federal court."). For the reasons described earlier in the Court's analysis of the issue of accrual, tolling in this case is governed by Texas law through the borrowing statute. *See Speight*, 437 F.2d at 783 n.4.

"[T]he Texas courts have not extended [their general adoption of *American Pipe* tolling] to allow a federal class action to toll a state statute of limitations." *Newby v. Enron Corp.*, 542 F.3d 463, 472 (5th Cir. 2008) (citations omitted). Plaintiffs' class membership in federal class action lawsuits thus did not toll the statutes of limitation governing their state law claims, regardless of which state's law applies.

Plaintiffs' second argument is that defendants' fraudulent concealment of their conduct tolled the statutes of limitations. In Texas, the discovery rule "applies in cases

of fraud and fraudulent concealment" as well as in cases of where information is inherently undiscoverable. *Murphy*, 964 S.W.2d at 270. Equitable tolling based on fraudulent concealment "ends when the party learns of facts or circumstances that would lead a reasonably prudent person to inquire and thereby discover the concealed cause of action." *West v. Proctor*, No. 07-10-00484, 2011 WL 3925802, at *3 (Tex. App. Sept. 8, 2011). The Court has already determined that the "facts and circumstances" of plaintiffs' notices of audit and knowledge of an IRS program should have led them to inquire further into their potential claims as of no later than May 5, 2004. Fraudulent concealment did not toll the limitation period beyond this date.

For these reasons, the Court dismisses with prejudice Counts 3, 4, 5, 7, and 9 of plaintiffs' complaint.

## B.     Claims under RICO

### 1.     Statute of limitations

A four-year limitation period governs civil RICO claims. *Rotella v. Wood*, 528 U.S. 549, 552-53 (2000). Though Texas substantive law does not govern the question of when the limitation period started running for these claims, the accrual analysis is much the same as that in the previous section.

RICO claims are also subject to a discovery rule: a claim accrues when a plaintiff discovers that defendants' behavior has caused some injury to the plaintiff. *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 386-87 (7th Cir. 2010) (citing *Rotella*, 528 U.S. at 553). A plaintiff need not discover that there was any sort of behavioral pattern or enterprise of the kind that RICO requires in order for his claim to accrue. *Id*. Courts construing RICO have followed general discovery-rule principles of

requiring plaintiffs to exercise ordinary diligence in pursuing knowledge of a potential claim, given the statute's intended function of encouraging "private attorneys general" to pursue their claims. *See, e.g.*, *Jay E. Hayden Found.*, 610 F.3d at 385-386; *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 507-08 (3d Cir. 2006); *Matthews v. Kidder, Peabody & Co.*, 260 F.3d 239, 251 (3d Cir. 2001). The Court therefore determines that, under the same discovery principles that apply to plaintiffs' state-law claims, their RICO claims with regard to OPIS accrued no later than October 4, 2002, and that their claims with regard to BLIPS accrued no later than May 5, 2004.

Unlike plaintiffs' state-law claims, however, the limitation periods for their federal claims were tolled by virtue of the pendency of the federal class actions in which they were class members. Specifically, "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *American Pipe*, 414 U.S. at 554. The plaintiffs assert that their class membership in *Becnel* (filed January 28, 2005; class certification denied August 9, 2005) and *Kottler* (filed September 5, 2005; class certification denied March 29, 2010), taken together, tolled the limitation period for over five years.

Because *Becnel* did not include any federal claims, it may not have tolled the limitation period for plaintiffs' RICO claims. *Compare In re Copper Antitrust Litig.*, 436 F.3d 782, 795 (7th Cir. 2006) (noting that with regard to a class action in federal court, if "the substantive law involved is still state law," claims under "an analogous federal statute have not been invoked [and] there must be identity of claims for tolling to be operative."), *with Tosti v. City of Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1985) ("We

find no persuasive authority for a rule which would require that the individual suit must be identical in every respect to the class suit for the statute to be tolled."). But *Kottler*, which included a RICO claim, tolled the statute for a sufficient period to keep plaintiffs' RICO claims alive. The periods between the accrual of the OPIS and BLIPS claims and the filing of *Kottler* were approximately thirty-five months (October 2002 to September 2005) and sixteen months (May 2004 to September 2005) respectively. The period between the denial of class certification in *Kottler* on March 27, 2010 and the filling of the present lawsuit on January 7, 2011 was approximately eight months. Thus even without considering *Becnel*, the limitation period did not run on the plaintiffs' RICO claims before they filed this suit.

## 2. PSLRA bar

The Private Securities Litigation Reform Act of 1995 (PSLRA) amended RICO to provide that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). Defendants contend that "given the integral role played by the sale of securities in the alleged promotion and implementation of the tax strategies on upon which Plaintiffs base their RICO claims," plaintiffs could have asserted securities claims based on this conduct, and as a result, their RICO claims are barred. Def.'s Mem. at 16-17.

This argument focuses on the fact that in their dealings with defendants, plaintiffs were hoping to minimize the income tax consequences of sales of securities they had recently sold. Were this the only role that securities played in the transactions at issue, the PSLRA would not bar plaintiffs' claims. Framed this way, the claims "do not allege

19

a securities fraud, but rather a tax fraud." *See Kottler v. Deutsche Bank AG*, 607 F.

Supp. 2d 447, 458 n.9 (S.D.N.Y. 2009).

The plaintiffs' sales of earlier-held stock, however, were not the only securities

transactions that their RICO claims bring into play. Specifically, plaintiffs allege that the

OPIS and BLIPS strategies themselves involved securities about which plaintiffs claim

defendants made misrepresentations. The complaint makes repeated references to

defendants' alleged representations that "*the tax-reducing investment strategies would*

*yield a substantial profit* and at the same time legally minimize Plaintiffs' tax liability."

Compl. ¶ 13 (emphasis added); *see also id.* ¶ 15 ("Defendants[] assert[ed] . . . that the

[OPIS strategies] were bona-fide investments that could yield a substantial profit and at

the same time legally reduce Plaintiffs' taxes."); *id*. ¶ 35 (noting that OPIS clients

generally "believed [they] had a reasonable opportunity to earn a reasonable profit from

each of the transactions . . . in excess of all associated fees and costs and not including

any tax benefits that may occur") (citations and internal quotation marks omitted); *id*. ¶¶

27, 47-51, 71. The complaint further alleges that these representations were false

regarding both the investment results and the tax consequences. *See, e.g.*, *id*. ¶ 13

("[T]he Defendants knew or should have known that the tax-reducing investment

strategies would not and could not yield the investment results or tax treatment

claimed."); *id.* ¶ 135(15)-(16) (accusing defendants of "[a]dvising Plaintiffs that there

was a reasonable likelihood of making a profit on the 'investment' component of the

Investment Strategies" and "[f]ailing to advise Plaintiffs that Plaintiffs would not and/or

could not make a profit on the 'investment' component of the Investment Strategies.").

In sum, plaintiffs make clear from their descriptions of OPIS and BLIPS that the

strategies themselves involved significant securities transactions. More importantly, they repeatedly allege that defendants made false and misleading representations about the securities transactions – not just regarding their tax effects, but also regarding their profitability.

Plaintiffs' allegations that they did not receive the profits that defendants advertised distinguish this case from *Kottler*, in which "the securities performed exactly as planned and marketed." *Kottler*, 607 F. Supp. 2d at 457 n.9. Instead, the complaint presents a clear case where "the scheme to defraud and the sale of securities coincide." *See SEC v. Zandford*, 535 U.S. 813, 822 (2002). A number of courts have found the PSLRA to bar RICO claims regarding similar or identical tax-reducing investment strategies even without the specific allegations regarding securities that are present here. *See, e.g.*, *Ling v. Deutsche Bank*, No. 04-4566, 2005 WL 1244689, at *6 (S.D.N.Y. May 26, 2005) ("[For some] Plaintiffs, the sale of securities was necessary to effectuate the tax strategy, and as to those the RICO claims are actionable as securities fraud and are barred by the PSLRA."); *Stechler v. Sidley, Austin Brown & Wood, LLP*, 382 F. Supp. 2d 580, 598 (S.D.N.Y. 2005); *Swartz v. KPMG, LLC*, 401 F. Supp. 2d 1146, 1151-52 (W.D. Wash. 2004), *rev'd on other grounds*, 476 F.3d 756, 761 (9th Cir. 2007) (adopting district court's PSLRA analysis in full); *Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 373 (S.D.N.Y. 2004); *Jacoboni v. KPMG LLP*, 314 F. Supp. 2d 1172, 1180 (M.D. Fla. 2004); *Loftin v. KPMG LLP*, No. 02-81166, 2003 WL 22225621, at *6 (S.D. Fla. Sep. 10, 2003). Plaintiffs' allegations here present an even clearer call for application of the PSLRA bar.

The Court concludes that plaintiffs' complaint alleges a scheme concerning

21

falsely marketed investments and knowingly fraudulent representations that the plaintiffs would make significant gains from those investments and would experience favorable tax consequences.  The plaintiffs' RICO claims are actionable as securities fraud and are therefore barred by the PSLRA.

For these reasons, the Court dismisses with prejudice counts 1 and 2 of the plaintiffs' complaint.

## Conclusion

For the reasons stated above, the Court grants defendants' motion to dismiss plaintiffs' complaint [docket no. 24].  The Clerk is directed to enter judgment in favor of the defendants.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: September 26, 2011